George W. Offutt, III, and Jane P. Offutt and Pimmit Development Corporation v. Commissioner.Offutt v. CommissionerDocket Nos. 87006, 87007.United States Tax CourtT.C. Memo 1963-126; 1963 Tax Ct. Memo LEXIS 217; 22 T.C.M. (CCH) 589; T.C.M. (RIA) 63126; May 8, 1963James Mullen, Esq., 1001 E. Main St., Richmond, Va., LeRoy R. Cohen, Jr., Esq., Frederick T. Gray, Esq., and Frank A. Hardy, Esq., for the petitioners. W. Ralph Musgrove, Esq., for the respondent. FISHERMemorandum Findings of Fact and Opinion FISHER, Judge: These proceedings involve income*218 tax deficiencies for 1954, 1955 and 1956 and additions to tax for 1954, as follows: Addition to Tax,PetitionerYearDeficiencySec. 294(d)(1)(A)Docket No. 87006George W. Offutt, III and Jane P. Offutt1954$ 34,234.65$3,906.201955514,901.841956328,395.62Docket No. 87007Pimmit Development Corporation7-31-54$ 33,575.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,457.677-31-563,063.64There are a number of issues involved (19 are listed in petitioners' brief, and 20 in respondent's), the most important of which relate to various transactions between petitioner, George W. Offutt, III, and an associate, John W. Register, or between them and several wholly or partially owned corporations through which they operated real estate developments known as Pimmit Hills and Manassas Park subdivisions. One of such corporations, Pimmit Development Corporation, is the petitioner in Docket No. 87007. Several of the minor issues raised in the pleadings have been settled by agreement which will be given effect under Rule 50. A more precise statement of the issues, some of which have been combined, will be set out below with separate findings of fact and opinions. *219 General Facts Some of the facts have been stipulated and are found accordingly. Petitioners, George W. Offutt, III, and Jane P. Offutt, are husband and wife, now residing at Hobe Sound, Florida. During the years under consideration they maintained, and still maintain, a business office at Bellevue Farm, Warrenton, Virginia, their former home. Their returns for the calendar years 1954, 1955 and 1956 were filed with the district director of internal revenue at Richmond, Virginia. The petitioner in Docket No. 87007, Pimmit Development Corporation, is a Virginia corporation whose business address is also Bellevue Farm. Its returns for all of the years here involved were also filed with the district director of internal revenue at Richmond, Virginia. The returns were for fiscal years ending July 31. For a number of years petitioner, George W. Offutt, has been engaged, either individually or through various corporations, in the development of real estate, particularly the subdivision of land and the construction and sale of houses. Issues 1, 2 and 3 1. Whether the payment by Pimmit Service Corporation of a tax liability of Offutt Construction Corporation was income to Offutt. *220 2. Whether the value of water and sewerage facilities constructed by Pimmit Development Corporation and transferred to Pimmit Service Corporation is taxable to Offutt as a dividend distribution. 3. Whether the cost of such facilities was a part of the cost of the houses sold by Pimmit Development Corporation. Findings of Fact In 1950 Offutt's wholly-owned corporation, Offutt Construction Corporation, (Offutt Construction) acquired a tract of land which later was developed as Sections 1 and 2 of Pimmit Hills, a subdivision located in Fairfax, Virginia, near Falls Church. In developing Pimmit Hills, Offutt first sought, unsuccessfully, to have the water and sewerage service furnished by the City of Falls Church or Fairfax County. Without provision for proper water and sewerage service, the state and county authorities would not give their approval for the project. For the purpose of providing such service, Offutt, in June 1956, organized Pimmit Service Company (Pimmit Service) as a public service company under the laws of the State of Virginia. All of its stock was issued to Offutt. Offutt Construction built houses in Sections 1 and 2 of Pimmit Hills and also constructed*221 the water and sewerage facilities. It conveyed these facilities to Pimmit Service without any consideration except for Pimmit Service's obligation to maintain the facilities and furnish continuous water and sewerage service to the houses in the subdivision. After completion of Sections 1 and 2, Offutt Construction was dissolved on November 26, 1954, and a liquidating distribution of $76,000 was made to Offutt, its sole stockholder. In its income tax returns Offutt Construction treated the costs of the water and sewerage facilities, $122,337.26, as a part of the cost of the houses and lots sold. In the latter part of 1953 or early in 1954, Internal Revenue Service questioned the right of Offutt Construction to deduct the cost of the water and sewerage facilities which it had transferred to Pimmit Service. To settle the dispute, Pimmit Service, in June 1954, paid on behalf of Offutt Construction additional taxes of $36,991.63. Respondent determined in his notice of deficiency to Offutt that this amount was taxable to him individually as a dividend distribution. About 1950, Offutt became associated with a builder, John W. Register. Together they organized several corporations which*222 they utilized at Pimmit Hills and Manassas Park. A corporation known as O. and R. Construction Company (O. & R. Construction) was formed to build houses in the Pimmit Hills subdivision. Two other corporations, Pimmit Development Corporation (Pimmit Development), the petitioner in Docket No. 87007, and Greenacres, Incorporated, were organized to operate in the Pimmit Hills area. The activities of some of those corporations were financed by loans from Investors Diversified Services (I.D.S.). The Washington area manager of I.D.S., E.M. Bros, became a minority stockholder in some of those corporations. Pimmit Development was organized August 7, 1953, to purchase and subdivide land and sell building lots. Its stock was issued 40 percent to Offutt, 40 percent to Register and 20 percent to Bros. In June 1954, Pimmit Development acquired a tract of land in the Pimmit Hills area which it proceeded to develop as Sections 7 and 8 of that subdivision. In April 1955, by prior agreement with the Board of Supervisors of Fairfax County, the water and sewerage facilities for those sections, after their construction by Pimmit Development, were transferred to Pimmit Service without consideration, *223 as were the facilities in Sections 1 and 2. Jefferson Mortgage Corporation, a subsidiary of I.D.S. which had financed some of the Pimmit Hills development and held title to one-half of the houses in Section 7, joined with Pimmit Development in the transfer. Altogether, there were 1,700 or 1,800 houses built in the Pimmit Hills subdivision. The total cost of the facilities was $204,510.22. In its return for 1955, Pimmit Development treated this amount of $204,510.22 as part of the cost of goods sold. Respondent determined in his notice of deficiency to Pimmit Development that the cost of the facilities was not deductible as cost of goods sold, and further determined, in his notice of deficiency to Offutt, that the transfer of the facilities to Pimmit Service resulted in a dividend distribution to him, its sole stockholder, in the amount of $204,510.22. In his returns for 1954, 1955 and 1956, Offutt reported compensation from the above-named corporations as follows: 195419551956Pimmit Development$35,072.00$20,084.00Pimmit Service5,072.0010,168.00$2,040.00O. & R. Construction15,072.00Greenacres, Incorporated8,557.33Opinion *224 The first of the three issues predicated on the above-stated facts is whether the payment by Pimmit Service of the additional tax of $36,991.63 assessed against Offutt Construction was a dividend constructively received by Offutt. Respondent's position is that since Offutt Construction and Pimmit Service were both wholly-owned by Offut it was, in essence, the same as if Pimmit Service had declared and paid a cash dividend to Offutt and he in turn had paid the taxes of Offutt Construction. Respondent's theory rests on the long established rule that a distribution of earnings and profits by a corporation to or for the use of a stockholder is taxable to him as a dividend. ; (C.A. 4, 1947); ; ; ; ; . On the facts of record respondent's view of the transaction seems the only acceptable one. We see no other route by which the earnings*225 of Pimmit Service could have reached Offutt Construction than through Offutt. The payment by Pimmit Service of Offutt Construction's taxes was not intended as consideration for the assets which it had transferred to Pimmit Service or as a loan from Pimmit Service. Offutt contends that Pimmit Service paid the tax because Offutt Construction had no liquid assets and because representatives of the Internal Revenue Service had stated that Pimmit Service was liable for the tax as a transferee. However, he does not follow up this contention with proof that it was necessary for Pimmit Service to pay the taxes to protect its assets. On the dissolution of Offutt Construction, Offutt; personally, received a liquidating dividend of over $76,000. No contention is made that as a transferee he would not have been liable for, and able to pay, the additional taxes assessed against Offutt Construction. The evidence does not support the contention, if such is intended, that Pimmit Service made the payment in its own interest. See Of course, had it done so, no liability would have fallen on Offutt to repay the amount to Pimmit Service. For all that appears, it*226 was only for Offutt's interest and because of his control over Pimmit Service that its funds were used to pay Offutt Construction's taxes. In , the Court said (p. 580), referring to and : Decision in these cases was rested on the principle that the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach of the statute taxing income "derived from any source whatever." * * * We find no error in respondent's determination that the payment by Pimmit Service of the taxes of Pimmit Development was the equivalent of a dividend distribution by Pimmit Service of that amount to Offutt. The second and third issues are whether the transfer of the water and sewerage facilities to Pimmit Service by Pimmit Development in 1955 resulted in a dividend distribution to Offutt, and whether Pimmit Development is entitled to deduct the cost of construction of the facilities as a part of the cost of the lots sold. Respondent*227 contends that since Offutt had a "stock ownership connection" with Pimmit Development, with complete control over the transfer of its assets, and was the sole stockholder of Pimmit Service, the transfer resulted in a dividend distribution to him, to the extent of the earnings and profits of Pimmit Development available for dividend distribution, namely, $167,056.18, and a capital gain of $38,614.04, the remainder of the cost of the facilities. The result was the same, respondent says, as if Pimmit Development had distributed the facilities to Offutt and he in turn had paid them into his wholly-owned corporation, Pimmit Service. Offutt was not the sole stockholder of Pimmit Development. In fact, he was not even a majority stockholder; he owned 40 percent of the stock, Register 40 percent and Bros the remaining 20 percent. Respondent does not explain what, under his theory, became of the 60 percent interest of the other Pimmit Development stockholders in the transferred assets. He does not contend that the other stockholders received any dividend or other consideration for their interests. His contention is that the facilities were all constructively distributed to and received by*228 Offutt through Pimmit Service. The evidence is that it is common practice, in the State of Virginia, at least, for real estate developers to construct the water and sewerage facilities in conjunction with the other improvements and to transfer them to a municipality or public service corporation without any consideration except the transferee's obligation to furnish service to the purchasers of homes in the subdivision at rates prescribed by the State Corporation Commission. That is what was done by the developers of other sections of Pimmit Hills in which Offutt had no interest. Under the laws of Virginia, the developers could not have obtained authorization for the sale of the houses without approved provisions for water and sewerage service, and these could be furnished only by a municipality or a regulated public utility. It was for that reason that Pimmit Service was organized as a public service corporation. Other than the bare inference to be drawn from Offutt's stock ownership in the two corporations, there is no evidence to support respondent's determination that the transfer of the facilities by the one corporation to the other was a device for syphoning off corporate*229 profits to him, or, in any manner partook of the nature of a dividend distribution. The evidence does not require a disregard of the corporate entities, nor does respondent so contend. The more reasonable view, it seems to us, and the one contemplated by the parties, is that the construction of the water and sewerage facilities by Pimmit Development and their transfer to Pimmit Service were necessary and expedient steps in the development of the subdivision and were principally for the purpose of making the lots salable to the public. The transaction was between the two corporations. No transfer of assets was ever made to Offutt. We see no reason to ignore the corporate entities and we therefore hold that the transactions did not result in any dividend distribution to Offutt. We are of the opinion that Pimmit Development properly treated the cost of constructing the water and sewerage facilities as a part of the cost of the lots sold. See ; . Country Club Estates, Inc., was distinguished from , affirmed on other issues, ,*230 on the grounds that in the former, but not in the latter case, the taxpayer had parted with ownership of the facilities. In the Collins case the expenditures were for a sewerage disposal system which the developers transferred to a wholly-owned corporation, which in turn transferred it back to the developers as trustee for the homeowners. Here Pimmit Development divested itself of ownership of the facilities and here, also, Pimmit Service assumed the obligation of furnishing continuous service at reasonable rates to the purchasers of the houses in the subdivision. Issue 4 Whether the transfer to Offutt by Pimmit Development of an undivided one-half interest in the commercial Parcels A and B in Pimmit Hills on August 13, 1954, resulted in a dividend distribution to him in that year and whether the sale of Parcels A and B to O. and R. Construction Company on April 1, 1955, was erroneously reported by Pimmit Development in its return for the fiscal year ended July 31, 1956. Findings of Fact The land for Section 8 of the Pimmit Hills subdivision containing about six acres was acquired by Pimmit Development in 1953 or in 1954 for $12,000. It was divided into Parcels A and B and*231 Building Lots 6, 7, 8, 9 and 13. It could not be divided into more building sites because of the nature of the terrain and zoning restrictions. Offutt and Register were advised that if title to the land was held by them individually, they might be able to get clearance for the number of lots necessary for economical development. Accordingly, on August 13, 1954, they had Pimmit Development convey Parcels A and B to themselves individually. However, the plan was not successful and on August 20, 1954, they conveyed the parcels back to Pimmit Development. No consideration passed in either conveyance. On April 1, 1955, after Section 8 had been developed with streets, curbs, gutters and water and sewerage facilities, Pimmit Development sold Parcels A and B to O. and R. Construction Company for $20,000. Pimmit Development erroneously reported this sale in its return for the fiscal year ended July 31, 1956. Opinion The evidence adduced at the hearing in this proceeding shows that the sale in question took place April 1, 1955, rather than in the year ended July 31, 1956. Accordingly, amendments to the pleadings have been filed by both parties requesting a transfer of the item in Pimmit*232 Development's returns from 1956 to 1955, and corresponding adjustments for each of such years. The proper adjustments will be made under Rule 50. In his notice of deficiency to Offutt (for the calendar year 1954), respondent determined that the Pimmit Development transfer of Parcels A and B to Offutt and Register resulted in a taxable dividend to Offutt of $10,000, the value of his one-half interest in the property. Respondent now concedes that Offutt did not realize any gain from this temporary transfer of title to the property to him. This, too, is subject to proper adjustment under Rule 50. Issue 5 Whether the value of the water and sewerage facilities transferred to Suburban Utility by Manassas Land in 1955 and 1956 is taxable to Offutt as a distributive share of profits from a joint venture. Findings of Fact Near the completion of the Pimmit Hills subdivision Offutt and Register began looking for another suitable tract for subdivision. A 500-acre tract, known as the Breeden Tract, was found in Prince William County near Manassas, Virginia. Offutt secured an option to purchase this property in April 1954. The option was in two parts, each of which covered 250 acres. *233 One, for which Offutt paid $1,000, gave him the right within 120 days to purchase the first 250 acres for $500 per acre and the second, for which he paid $10, the right to purchase the remaining 250 acres within two years for $1,000 per acre. On May 7, 1954, Offutt assigned the first part of the option on the Breeden Tract to a newly organized corporation, Manassas Land Development Corporation (Manassas Land), which agreed to exercise the option and convey to Offutt "all of the commercial land reserved out of the 250-acre tract conveyed and all of the outlots 1 necessary for water, sewer and other services." There was no other consideration for the assignment. All of the capital stock of Manassas Land was issued to Register or members of his family. Manassas Land was to function only as a development company; that is, it was to do the platting and make some of the initial improvements, such as streets, curbings, water and sewerage, and was then to sell the lots. Other corporations were formed to carry out different phases of the development, which came to*234 be known as the Manassas Park subdivision. Manassas Park, Inc., was organized to build houses. Its stock was issued to Offutt and Register in equal shares. Suburban Utility Corporation (Suburban Utility) was organized as a public utility company to furnish the necessary water and sewerage service for the subdivision. All of its capital stock was issued to Offutt. It was agreed between Suburban Utility and Manassas Land that the latter would install, or have installed, all the necessary water and sewerage facilities and convey them to Suburban Utility without consideration and that Suburban Utility would furnish complete water and sewerage service for the houses. Concurrently, Offutt agreed to lease to Suburban Utility such portions of the commercial land and the outlots, and also whatever portions of any later acquired land, as might be needed for water and sewerage purposes, for a term of 49 years at a rental of $200 per month, plus real estate taxes and assessments. Manassas Land exercised the option and purchased the 250 acres for $500 per acre July 29, 1954. Plans for proposed water and sewerage systems for Manassas Park were approved by the supervisors of Prince William County, *235 the State Water Control Board and the Department of Health. The surveying and platting was done by Manassas Land. Manassas Park was divided into six sections. Section 1 contained 100 building lots, Section 2, 305 lots and Section 3, 348 lots. On December 3, 1954, Manassas Land sold the 50 even numbered lots in Section 1 to Manassas Park, Inc., and the 50 odd numbered lots to Jefferson Mortgage for $300 per lot. Offutt was first president and a director of Manassas Park, Inc. He resigned as president at the first organization meeting held August 9, 1954, and Register, who owned the other 50 percent of the stock, was made president. Offutt was also employed by the company as superintendent of construction. He and Register were to receive salaries from the company of $50,000 per year each. On October 19, 1954, pursuant to agreement, Manassas Land conveyed to Offutt Parcels A and B of the so-called commercial area, containing respectively about 8 1/2 and 7 1/3 acres, and other well sites located in Section 1, and Offutt leased to Suburban Utility the necessary rights of way for the water and sewerage service. The same procedure was followed with respect to other commercial lots in*236 other sections of the subdivision. The building operations in Sections 1 and 2 of Manassas Park were financed by I.D.C. and its subsidiary, Jefferson Mortgage, under an arrangement similar to the one used at Pimmit Hills. Section 3 was financed by a different group of investors operating as Manassas Park Equipment Company. That company took title to all of the building lots in Section 3 and then contracted for Manassas Park, Inc., to build the houses. When completed the houses were sold by Manassas Park Development Company. Offutt was not satisfied with that arrangement and, in protest, he gave up his interest in Manassas Park, Inc., and assigned his 50 percent stock interest in the company to Register without any consideration. Manassas Land first engaged an independent contractor to build the water and sewerage facilities but this proved to be too expensive and the work was completed by another corporation, Manassas Equipment, which was organized by Offutt and Register for that purpose. That corporation was a successor to Greenacres which had been utilized to construct the utilities in the Pimmit Hills subdivision. Manassas Equipment's stock was first issued to Offutt and Register*237 in equal shares, but later a 20 percent interest was transferred to the company's construction superintendent. The costs of the facilities were paid by Manassas Park, Inc., out of construction loans. The completed water and sewerage facilities in Sections 1, 2 and 3 were conveyed to Suburban Utility by Manassas Land in 1955 and those in Section 5 in 1956. No houses were built in Section 4. As in the Pimmit Hills subdivision, the only consideration for the conveyances of the water and sewerage facilities to Suburban Utility was its obligation to furnish continuous water and sewerage services to the houses in the subdivision. For the years 1955 and 1956 Offutt reported compensation from the above-named corporations as follows: 19551956Manassas Park, Inc.$30,084$23,834Manassas Land10,084Suburban Utility3,700Opinion Respondent's position, as stated in his brief, is that Offutt and Register were conducting the Manassas Park project as a joint venture in which they utilized the several corporations and that "the various transfers of property to Mr. Offutt individually and at his direction and through his control to his wholly-owned corporation, *238 Suburban Utility Corporation, constitute the receipt of income from the joint venture by way of distribution of profits therefrom." In his notice of deficiency to Offutt, respondent included in income for 1955 and 1956 the respective amounts of $409,350 and $363,300, representing the value of the assets conveyed in those years to Suburban Utility by Manassas Land. Respondent has not determined, and does not now contend, that Offutt received the assets as a dividend distribution, as in the Pimmit Hills operation. His position is that the conveyance of the water and sewerage facilities by Manassas Land to Suburban Utility, Offutt's wholly-owned corporation, should be treated as a distributive share of profits from a joint venture to Offutt individually. In his brief, respondent stresses the broad taxing powers of the Government and the predominance of substance over form as a guide for determining the actualities of economic gain, citing such cases as ; ; ; ; and .*239 Granted the cited cases, and numerous others, make it clear that in tax matters the courts will look to substance rather than form and will give no recognition to schemes or devices serving no business purpose and intended only to minimize taxes. That approach, however, does not lead to a solution of our problems here. In some circumstances, such as the choice between a corporation, partnership or joint venture as a medium for conducting a business, form itself may be wholly determinative of the tax consequences. The three corporations with which we are chiefly concerned are Manassas Land, Manassas Park, Inc., and Suburban Utility. Each of these corporations performed separate and important functions in the subdivision development; Manassas Land held title to the real estate, put in the initial improvements and sold off the lots; Manassas Park, Inc., built and sold the houses; and Suburban Utility owned and operated the public utilities. Of the three companies, only as to Manassas Park, Inc., did Offutt and Register each own one-half of the stock. Offutt owned no stock in Manassas Land and Register owned no stock in Suburban Utility. Respondent does not contend that these corporate*240 entities should be disregarded, nor has he made any reallocation of income or expenses among them. The evidence is that in their dealings with each other Offutt and Register, as well as the corporations, were informal and sometimes lax, but they nevertheless maintained their separate interests. Some of the bills for supplies or labor furnished to other corporations were paid by Manassas Park, Inc., out of its construction loans, but generally they were charged to such other corporations. There was no general commingling of funds either by the corporations or by Offutt and Register. Separate books of account were kept by each and separate income tax returns were filed. There was never any agreement between Offutt and Register for an accounting on the project as a whole or for a division of the over-all profits or losses. Register, testifying as a witness for respondent, described his and Offutt's relationship as follows: Well, of course, Mr. Offutt had the utility company. I was to get something out of the land company and the building was to be divided since we owned the stock, 50% each, to be divided 50% after all expenses were paid. What constitutes a joint venture is a question*241 that has been before the courts a number of times and the cases have been generally uniform in defining the basic requirements for a joint venture as an association of two or more persons, without a formal partnership agreement or incorporation, to conduct a single business enterprise for their mutual benefit. See ; , and cases cited therein. The joint adventurers may be individuals or corporations. The evidence as a whole shows, we think, that the Manassas Park project was not conducted as a joint venture. Offutt and Register apparently expected their stock interests in the several corporations to return them approximately equal benefits but there was no agreement or arrangement for sharing profits or losses. Offutt expected no profits from Manassas Land and Register none from Suburban Utility. Under respondent's theory, Suburban Utility would have to be excluded from the joint venture. If this were not so, the transfer of the utility assets from Manassas Land to Suburban Utility would not have taken the assets out of the alleged*242 joint venture. Respondent claims support for his joint venture theory in the state court receivership proceedings brought against Manassas Land and others in 1958 in which it was decreed, pursuant to a settlement agreement, that part of the utility assets had been acquired by Suburban Utility, or Offutt, from Manassas Land without adequate consideration and should be sold and the proceeds distributed 60 percent to Offutt and 40 percent to the trustee, for the benefit of the creditors of Manassas Land. It is true that Offutt, Register, and seven corporations involved were referred to in paragraph 5 of the decree "individually and as joint venturers." Said paragraph 5 reads as follows: 5. Upon the sale of the assets of Suburban Utility Corporation, as defined in the settlement memorandum, upon settlement of the sale of the assets of Suburban Utility Corporation, and upon receipt of $36,647.96 from Manassas Shopping Center, Inc., and Manassas Park, Inc., the Receiver is authorized to execute and deliver on behalf of the creditors of Manassas Land Development Corporation general releases running to George W. Offutt, III, John W. Register, Suburban Utility Corporation, Manassas Equipment*243 Corporation, Manassas Park, Inc., Manassas Shopping Center, Inc., O. and R. Construction Corporation, Pimmit Development Corporation and Pimmet [Pimmit] Service Corporation, individually and as joint adventurers. The state court decree, however, was in implementation of a settlement agreement and we find no basis for its acceptance as an adjudication of the issue of joint venture in the instant case. Moreover, said paragraph 5 was a "release" clause, which was not a determination of a fact. The beneficiaries of the release were, of course, desirous of as broad protection as possible, whatever the facts might be. In our opinion, the conveyance of the utility assets to Suburban Utility did not result in a taxable distribution to Offutt. Issue 6. Whether Offutt realized income in 1954, 1955 and 1956 on the conveyance to him by Manassas Land of certain commercial tracts and well sites for water and sewerage use by Suburban Utility. Findings of Fact During 1954, 1955 and 1956 Manassas Land conveyed to Offutt the commercial parcels and well sites in the Breeden Tract which had been set aside for water and sewerage use as it had agreed to do at the time it acquired the Breeden*244 option from Offutt. Parcels A and B of Section 1 were conveyed to Offutt on October 19, 1954; well sites 2, 3 and 4 and 5 of Section 2, on February 8, 1955; Parcel C and well lot 6 of Section 3 on October 3, 1955; and Parcels F and K and well lots 7, 8 and 9 of Section 5 on May 24, 1956. Parcel A contained approximately 8 1/3 acres and B about 7 1/4 acres. Opinion Respondent has determined that Offutt realized income from the receipt of the above described properties of $25,000 in 1954, $12,000 in 1955 and $10,650 in 1956. Offutt contends, first, that the transfers of the properties in question to him did not give rise to the realization of income, and second, in the alternative, that the values placed on the properties by respondent are excessive. We do not reach the point of having to determine the values of the properties because, in our opinion, Offutt realized no taxable income in these transactions. We view the transfer of all these properties to Offutt not as a distribution to him of profits of a joint venture on which taxable gain might have been realized, but as one of the essential steps in the development of the subdivision as a whole. Offutt assigned his interest*245 in the option to Manassas Land; Manassas Land agreed to convey to him the commercial parcels and well sites; he agreed to lease them to Suburban Utility for a term of 49 years; and Suburban Utility agreed to supply water and sewerage service to the houses in the area. The water and sewerage service for which Suburban Utility was obligated to utilize the commercial land was essential to Manassas Land and the project as a whole. Actually, about the same result was reached here as in the Pimmit Hills subdivision where the commercial lots, along with the utility improvements, were conveyed to the public utility company without any money consideration and where, as we have held, no gain on the transfer resulted to Offutt. Issue 7. Whether Offutt realized income in 1955 on the conveyance to him by Manassas Land of 30 lots which were unsuitable for building sites and a single lot which was needed for water and sewerage use. Findings of Fact As mentioned above, there were a number of lots located in Section 3 of Manassas Park which were unsuitable as building lots. Some of them lay under a high voltage power line where houses could not be insured for FHA and VA approved financing*246 and some were situated on ground that was too low or uneven for the types of houses being built in the subdivision. In 1955 Manassas Land conveyed 61 of these lots to Offutt and Register for an agreed price of $168 per lot, their actual cost to Manassas Land. The conveyance was to Offutt and Register jointly, but they later agreed to divide the lots, Offutt taking 30 and Register 31. Offutt made no cash payment on the lots and the evidence is inconclusive whether he gave Manassas Land a promissory note or other form of indebtedness. In any event, his obligation to Manassas Land, if such there was, was finally extinguished by the decree of the Court in the receivership proceedings which Florence, Trustee, brought against Manassas Land andoffutt. On April 17, 1957, by agreement between Offutt and Register, Manassas Land conveyed to Suburban Utility an unimproved lot in Section 5 of Manassas Park for $346.59. This was the amount required to release the lot from the existing mortgage on the property. Suburban Utility needed the lot for access to its proposed disposal plant. Opinion Respondent has determined that Offutt realized a taxable gain on the acquisition of the 30 lots from*247 Manassas Land of $15,000. It does not appear from the notice of deficiency whether respondent determined that Offutt gave no consideration for the lots and that they are included in his income at their full value of $500 a lot or whether he determined that the value of the lots was $500 in excess of the amount which Offutt paid or agreed to pay for them. There is evidence that the value of the lots in question was, in fact, considerably less than $500. In his brief, respondent submits that the value of the lots is taxable to Offutt either as a distribution from the joint venture or as compensation paid to him as an employee of Manassas Land. He points out that Offutt reported in his 1956 return $10,084 as compensation received from Manassas Land. It is not claimed that Offutt ever sold any of the lots or received any income from them. For reasons stated above, we have rejected respondent's theory of a joint venture in the Manassas Park project and we find no support in the evidence for his contention that the lots in question were conveyed to him by Manassas Land as compensation for services. Ordinarily a taxpayer does not receive income by purchasing property, even at a bargain*248 price, if such was the case here. There is evidence that the value of the lots in question was little more than Offutt agreed to pay for them. Since neither of the theories on which respondent proposes to include the lots in Offutt's income is sound, and there being no other apparent theory on which respondent's determination can be sustained, we resolve the issue for petitioner. The ruling applies to the single lot for which Suburban Utility paid Manassas Land $346.59, as well as the group of 30 lots. Issue 8. Whether Offutt realized taxable income of $12,000 in 1956 from the partial construction by Manassas Land of two houses on two of the 30 lots mentioned in the issue next above. Findings of Fact In 1956, Register agreed to build for Offutt, at cost, two houses on two of the 30 lots which Manassas Land had previously conveyed to him. Offutt wanted the houses for use as residences for the manager and assistant manager of Suburban Utility. The houses were being built by Manassas Land and were about 60 or 70 percent completed when Manassas Land went into receivership in 1958. Thereafter, Offutt completed their construction at a cost of something over $3,000. The entire*249 cost of construction would have been about $4,500 for the smaller of the two, and $5,200 for the larger. Opinion Respondent has determined that the partial construction of these two houses by Manassas Land, all the stock of which was owned by Register, resulted in the realization of income by Offutt in 1956 of $12,000. There is evidence that the value of the partially completed houses was something less than $10,000 at the end of 1956, but whatever it may have been, we do not think it was income to Offutt in that year. Offutt had agreed to repay Manassas Land for the cost of constructing the houses. In spite of the failure of Manassas Land to perform its part of its agreement, it must have had some claim against Offutt for the work actually done. It does not appear that Manasses Land ever forgave that claim, or that Offutt repudiated it. What remained of it, apparently, was extinguished by the decree in the receivership proceedings brought against Manassas Land and Offutt in 1958. Whatever gain to Offutt may have resulted finally we do not think that it was income realized by him in 1956. Issue 9. Whether Offutt realized ordinary income (rather than capital gain) of $22,987.50*250 in 1956 on the sale of his one-half interest in an option known as the Davies option, and whether one-half the cost of platting the tract, which was paid by Manassas Land, was income to Offutt. Findings of Fact In May 1955, when the Manassas Park Subdivision was about one-half completed, Offutt and Register acquired an option on an adjacent tract of land of about 200 acres, referred to as the Davies Tract, which later came to be developed as Section 5 of Manassas Park. The cost of the option, $2,000, was paid by check of Manassas Park, Inc., in whose name the option was first taken. A short while later, Manassas Park, Inc., assigned the option to Offutt and Register jointly and Offutt gave Manassas Park, Inc., his check for $1,000. The option price for the land was $80,000, including the $2,000 paid for the option. The option had one year to run. Early in 1956 plans were made to have the Davies Tract developed by Manassas Land. A group of investors operating as Arlington Realty Company, Inc., (Arlington Realty) agreed to finance the construction of the houses. On March 20, 1956, Offutt and Register assigned the option to Arlington Realty (H. A. Florence, vice president of Arlington*251 Realty, Trustee) for $70,000. Arlington Realty exercised the option and purchased the land at the option price of $80,000. About March 28, 1956, the parties agreed as follows: Arlington Realty agreed to convey the land to Manassas Land for $210,000; Manassas Land agreed to pay $100 down and execute a trust deed for the balance, payable within one year at interest of six percent; Manassas Land agreed to pay all costs of subdividing the property. Arlington Realty agreed to make construction loans to Manassas Park, Inc., and O. & R. Construction Corporation, the builders, up to $5,500 per unit. Manassas Park, Inc., and O. & R. Construction Corporation agreed to build the first 100 houses on a trial basis. Arlington Realty agreed to convey to Manassas Land sufficient land, up to 100 acres, for water and sewerage facilities and to make the necessary water and sewerage connections. Suburban Utility agreed to furnish water and sewerage service to the houses to be built. The water and sewerage facilities were conveyed to Suburban Utility by Manassas Land on May 24, 1956. In his return for that year Offutt reported long-term capital gain on the sale of his interest in the Davies*252 option of $34,000, one-half of the $70,000 sale price for the option to Arlington Realty, less his cost of $1,000. Respondent determined in his notice of deficiency that Offutt realized ordinary income on the sale of the option of $22,987.50. He computed a total gain on the sale of $45,975 by allowing Offutt and Register a basis for the option of $24,025, instead of $2,000. The $24,025 included expenses paid by Manassas Land for having the tract platted. These expenses, respondent determined, were paid by Manassas Land on behalf of Offutt and Register while they held the option. Consistent with this determination, respondent has included in Offutt's income for 1955 and 1956, the respective amounts of $1,942.50 and $10,992.50, said to represent his one-half portion of the platting expenses paid by Manassas Land in those years. 2Opinion Respondent's position is that the transactions relating to the Davies option were merely manipulations by which Offutt and Register, in the conduct of their joint venture, sought to syphon off $70,000 of the funds of Manassas Land for their personal*253 benefit. Undoubtedly, there was a purpose in the method which Offutt and Register chose for getting the ownership of the land in Manassas Land at the inflated cost of $210,000. That was $130,000 over the option price at which they could have purchased it under their option. Of the $210,000, $70,000 went to Offutt and Register and $60,000 went to Arlington Realty, presumably for their part in financing the building operations. Arlington Realty paid $70,000 for the option; paid the owners of the land $80,000; and sold the land to Manassas Land for $210,000. The purpose for choosing this method was probably threefold: (1) To give Offutt a profit on the option; (2) to convert some of the future earnings of Manassas Land into capital gain for the benefit of Register and (3) to provide financing by Arlington Realty. As for Offutt, the same result might have been reached if he and Register had sold the option to Manassas Land instead of Arlington Realty for $70,000. But then Arlington Realty might not have been willing to finance the project. Apart from these conjectures, however, we cannot say that the transactions were so lacking in substance that they should be disregarded for tax*254 purposes. We think that Offutt correctly reported his gain from the sale of the option as capital gain. We can see no valid basis for respondent's treatment of the costs of platting the tract which were paid by Manassas Land in its regular course of business as income to Offutt. Platting land for subdivision is usually done by the owner and developer. It is an item of cost, not of income, to the owner. Assuming that all of the platting here was done while Offutt and Register held the option, the evidence is that it did not particularly benefit them or increase the sale price of the option to Arlington Realty. Offutt had no agreement with Manassas Land for the platting. Respondent erred, we think, in including any of the costs of the platting in Offutt's income. Issue 10 Whether Pimmit Development sustained deductible losses on the sale of two automobiles to Suburban Utility and Manassas Land in 1955, and whether the excess value over the sale price of the one sold to Suburban Utility is taxable to Offutt as a dividend distribution. Findings of Fact In 1955 after completion of the Pimmit Hills subdivision, Pimmit Development sold to Suburban Utility and Manassas Land two*255 automobiles which it had acquired for Offutt's and Register's use on the subdivision. In its return for 1956 (the fiscal year ended July 31, 1956), Pimmit Development listed the automobiles as 1955 Cadillac coupes, purchased in December 1954 for $7,118.41 each and sold in December 1955 for $3,600 each. The loss claimed on each, after depreciation allowed of $3,126.20, was $392.21. In his notice of deficiency to Pimmit Development, respondent determined (a) It is held that no deduction is allowable for the lost in the amount of $784.42 on the sales of two automobiles to two stockholders owning more than 50 percent in value of the outstanding stock, directly or indirectly. * * *Opinion We are satisfied that one of the automobiles in question was sold to Suburban Utility, and not to Offutt personally; that the automobile had been used by him regularly on the Pimmit Hills construction job and was in very bad condition; and that the other automobile was sold to Manassas Land. While the evidence is meager, we think it is sufficient to establish error in respondent's determination that the claimed losses are not allowable to Pimmit Development because the automobiles were sold*256 to stockholders of that company. In determining the deficiency against Pimmit Development respondent has made no determination of the actual value of the automobiles at the time of their sale. In his notice of deficiency to Offutt, respondent determined that "the excess of the fair market value of the automobile purchased from Pimmit Development Corporation over the price paid, is a distribution to you." Respondent's computation shows total distributions from Pimmit Development of $205,910, which includes $1,400 as the excess of the value of the automobile over the price paid for it. On the facts of record we find that the sale of the automobile by Pimmit Development to Suburban Utility was not the equivalent of a distribution to Offutt individually. Respondent apparently was in error on the facts in determining that Pimmit Development sold the automobiles to its stockholders. Neither Suburban Utility nor Manassas Land, the purchasers, owned any of Pimmit Development's stock. Offutt and Register owned 80 percent and a third party owned 20 percent. As noted above, respondent does not propose to disregard these corporate entities. As we understand the facts the automobiles in question*257 were acquired by Pimmit Development for the use of Offutt and Register at Pimmit Hills and, as the work was being completed, they were transferred to the Manassas Park corporations for the same use at that subdivision. These transfers, we think, were bona fide sales resulting in the losses claimed by Pimmit Development and no taxable gain, by way of a distribution, to Offutt. Issue 11 Whether Offutt is entitled to a depreciation deduction in 1956 of $28,750 on a race horse known as Roman Matron. Findings of Fact In January 1956 Offutt purchased a race horse, Roman Matron, for $30,000. Roman Matron was a brood mare and was then in foal. She was 16 or 17 years of age at that time. The foal was delivered during that year. In his return for 1956 Offutt claimed a depreciation deduction on Roman Matron of $28,750. In his notice of deficiency to Offutt, respondent allowed depreciation of $6,875, being the difference between the cost of $30,000 and salvage value at the end of 1956 of $23,125. Opinion The only evidence of any weight on this issue is the testimony of a veterinarian who appeared as a witness for Offutt. He testified on direct examination that he had had wide experience*258 with race horses and brood mares, both on his own behalf and for others; that he attended Roman Matron professionally in 1956; and that in his opinion her value at December 31, 1956, was about $1,000 or $1,500. The witness gave no basis for his opinion that Roman Matron had a value of not more than $1,000 or $1,500 at the end of 1956. He expressed no opinion as to whether she had a value of $30,000 when purchased by petitioner. He recounted no physical condition that might have affected her usefulness as a brood mare or caused depreciation of more than 90 percent in her value during the 12 months or so of Offutt's ownership. That Offutt was willing to pay $30,000 for a brood mare, in foal, which a year later, after delivery of the foal, was worth only $1,500, gives rise to an inference that at least a substantial part of the $30,000 was paid for the foal. Whether Offutt still owned the foal at the end of the year and what its value may have been is not shown. We are not told either what further use or final disposition may have been made of Roman Matron. Even accepting the opinion testimony of petitioner's witness that Roman Matron was not worth more than $1,000 and $1,500 at*259 the end of 1956, that alone would not establish petitioner's right to deduct the difference between that value and cost as a reasonable allowance for depreciation. We held in , affd. (C.A. 5, 1958), that the taxpayer was not entitled to deduct accelerated depreciation on a race horse which had to be retired from racing because of an injury. The difference between depreciated cost and salvage value for which the horse was sold was, we held, a capital loss. Respondent's allowance of $6,875 of the $28,750 of depreciation claimed on Roman Matron for 1956 is not shown to be less than a reasonable allowance for depreciation. Issue 12 Whether expenditures aggregating $1,211.02 ($921.02 and $290.00) which Pimmit Development incurred in the operation of its Pimmit Hills sewerage disposal plant prior to its transfer of the facilities to Pimmit Service in April 1955 but did not pay until 1956 are deductible by Pimmit Development in its return for the fiscal year ended July 31, 1956. Opinion Pimmit Development now concedes on brief that the amount in question was in fact an expense of the prior year and was*260 erroneously claimed as a deduction in its 1956 return. It contends that the amount should be added to the $204,510.22 cost of the facilities transferred to Pimmit Service discussed in Issue 2 above. The pleadings contain no request for such an adjustment. Petitioner alleges in its petition that the deduction of the items was erroneously disallowed by respondent and in his answer respondent makes a general denial of such allegation. Neither party has moved for any amendment of the pleadings regarding either of the items, and the question relating to additions to the cost of facilities is not before the Court. On this state of the pleadings, and on the concessions made by petitioner, the respondent's disallowance of the items in question in Pimmit Development's return for 1956 is sustained. *Issues 13, 14, 15 and 16 In addition to those discussed above, the following issues have been conceded. 13. Pimmit Development*261 concedes that it is not entitled to the deduction of $632.48 in 1955 claimed in its return as "horse" expense. 14. Pimmit Development concedes that it is not entitled to the deduction of travel and entertainment expenses of $6,953.66 in 1954 and $2,200 in 1955. 15. Offutt concedes that there should have been included in his income for 1954 travel expenses [in] the amounts of $2,210.50 and $481.60. 16. Offutt concedes that he is liable for additions to tax under section 294(d)(1)(A) of the Code of 1939 for the year 1954, in such amounts as will be determined under Rule 50 in accordance with the Court's determination in the foregoing issues. Decisions will be entered under Rule 50. Footnotes1. By "outlots" was meant lots which were unsuitable for residences but could be used for water or sewerage purposes.↩2. There is an imbalance in these figures which is not explained in the evidence of record.↩*. By official order of the Tax Court, dated June 12, 1963 and signed by Judge Fisher, the court's opinion, filed May 8, 1963, was amended by striking the number 12 above the last paragraph and adding the four paragraphs beginning with the caption "Issue 12".↩